## THE GUYANDOTTE and THE DELAWARE.

(Circuit Court of Appeals, Second Circuit. March 1, 1899.)

### No. 59.

COLLISION — STEAM VESSELS CROSSING — FAILURE TO CONTINUE MANEUVER AS AGREED BY SIGNALS.

A steamship and a tug, with a tow, exchanged signals for crossing in accordance with the starboard rule, the steamship being the privileged vessel, at a sufficient distance apart to enable the maneuver to be executed with safety, but the master of the tug, which had reversed, fearing collision, interrupted the maneuver, and again started ahead, and a collision resulted, in which the tow was injured. The weight of evidence showed that the steamship held her course after the exchange of signals. *Held*, that the tug was alone in fault for the collision, regardless of any fault in the navigation of either vessel prior to the exchange of signals.[1]

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon appeal from a decree of the district court, Southern district of New York, holding both respondents liable for damage done to libelant's car float. The car float was in tow of the tug Delaware, and lashed to her starboard side, and was in collision with the steamer Guyandotte on the afternoon of April 30, 1897, in about the middle of the North river, near the upper White Anchorage Buoy, off the coal docks at Communipaw.

The following is the opinion of the court below (BROWN, District Judge):

A little after 3 o'clock in the afternoon of April 30, 1897, as the libelant's float No. 3, 185 feet long, was going out of the East river in tow of the tug Delaware and on her starboard side and crossing the North river towards Harsimus cove, above the Pennsylvania Railroad ferry in Jersey City, she came in collision with the stem of the steamer Guyandotte going down the North river, which struck the float on her starboard side some 20 or 30 feet from her stern, causing the damage for which the above libel was filed.

The collision was not far from the middle of the river and probably from 100 to 300 yards above the White Anchor Buoy, between Ellis Island and Castle Garden. The tug and float in crossing on the last of the ebb tide were headed a little up river. The Guyandotte, 265 feet long, was outward bound for sea. After leaving her pier at Beach street, she came down in about the middle of the North river. Ahead of her an Annex ferryboat was crossing from Jersey City towards the East river and the Guyandotte changed her course about a couple of points to starboard in order to pass under the stern of the ferryboat, which accordingly crossed the bows of the Guyandotte and passed several hundred feet to the northward of the tug and float below. The mate of the Guyandotte, who was on the bridge of the steamship with the master, observed the tug and tow before the ferryboat crossed their bow. The master did not observe them until the steamship passed behind the ferryboat and was

[1] For signification of signals of meeting vessels, see note to The New York, 30 C. C. A. 630.

in her wake. He then starboarded his wheel in order to straighten his course again directly down river, and soon after for the first time observed the tug and float a little on his port bow, about two points according to his estimate, more or less. After starboarding more or less he steadied and gave to the tug a signal of one whistle, which was answered by the tug with one whistle. About a half a minute afterwards or less, fearing collision, he hard a-ported and reversed, but struck the float at an angle of about three or four points.

The wheelsman on the tug states that he saw the Guyandotte coming down before the Annex ferryboat crossed her bows, and that she then seemed to be heading towards the stern of his float; and that he supposed the Guyandotte would go astern of him. When afterwards he saw the Guyandotte apparently sheering to the westward in order to go astern of the ferryboat, he stopped his engines when the ferryboat was between the tug and the Guyandotte, and immediately on answering the signal of the steamship after she had passed the stern of the ferryboat, he reversed full speed. A few moments afterwards the captain of the tug, who had been temporarily absent from the wheel house, returned, and when the Guyandotte was about 400 to 500 feet away and apparently pointing for his midships, so that the float was lapping across her bows, believing collision imminent, he ordered the engines full speed ahead and put the wheel hard a-port hoping the steamer would go under his stern.

All the evidence in the case shows that when the steamer crossed the wake of the ferryboat, she was only about 300 yards from the tug. She was going under one bell at the rate of six or seven knots an hour, and the tug at the rate of about three and one-half knots. It is not denied that the steamship had the right of way and that it was the duty of the tug to keep out of her way. On behalf of the latter, however, it is claimed that the collision was brought about by the starboarding of the steamer after she got astern of the ferryboat, and because the steamer had no lookout forward, and did not see the tug in time, and did not navigate properly in reference to her, either by keeping her original course, or the course two points to westward when she had changed to that course.

I am inclined to the opinion that when the steamer was first seen from the tug she was more nearly directly up river from the tug and tow, and heading more nearly towards them, than might be inferred from some of the testimony of the steamer's witnesses. She was probably but a little to the westward of the tug's place in the river. This is not only the direct testimony of the wheelsman of the tug and the floatman, but seems to be borne out by the testimony of the master of the steamer, that when he first noticed the tug she was only about a couple of points on his port bow, although he had then changed the heading of his steamer by porting on account of the ferryboat, a couple of points to the westward, and as he says had come back but little. All agree that the angle of collision was about three or four points; and considering that reversal by the tug would at first swing her more to the southward and that her porting afterwards was of short duration, and that the steamer's porting and subsequent reversal would both carry her head to the westward, tending to increase the angle of collision, it is difficult to see how the collision could possibly be at so small an angle as three or four points unless the Guyandotte had swung fully back to her original course under the influence of her starboard helm after passing astern of the ferryboat, before she could break her sheer by her port helm. And this agrees with the testimony of the Delaware's witnesses as to the apparent heading of the steamer.

If such was the true situation of the steamer before she crossed astern of the ferryboat, that is, pointing directly down river and being but little to the westward of the tug when from one-third to one-half a mile distant, it was as much the duty of the steamer to keep her course without change, unless something compelled the steamer to change that course, as it was the duty of the tug to keep out of the way; and the proper course of the tug was to keep on and to cross the Guyandotte's bows, as there would evidently be abundant time and space to do so. It does not appear that the steamer might not have avoided the ferryboat sufficiently by slowing or reversing, as well as by changing her course to the westward. If, however, she preferred to change her course to the westward, as that would require the tug to change her course

and go under the Guyandotte's stern, I think it was specially incumbent on the steamer to signify by signal to the tug below that she was intending to go to the right, and to keep that course when once taken, so that the tug could govern herself accordingly. No such signal was given; probably because the master, who was in charge of the navigation, did not at that time notice the tug. The tug, as I have said, when the ferryboat was between her and the steamer, prudently stopped her engines, uncertain apparently from the swing of the steamer to the westward, whether or not she meant to go astern of the tug as it was at first supposed she designed to do. The rule as to signals was designed to prevent just such uncertainties and miscalculations as this. But here the giving of the necessary signals on both sides was delayed until the steamer had crossed the wake of the ferryboat and for about half a minute swung her head under a starboard wheel, again somewhat to the eastward, towards the line of the tug and tow, when the vessels were perhaps 200 yards apart; so near that although they were both going at moderate speed, yet both being heavily loaded and not capable of quick handling, there was imminent danger of collision. It is possible that collision would have been avoided had the tug continued reversing. But this is doubtful, considering the fact that, as it turned out, the float nearly escaped by going ahead. However this may be, the blame should be ascribed to getting into that situation rather than to any mistake made when the situation became critical. Had timely signals been given by either, it is evident that the embarrassment of the tug would have been avoided, and she would have avoided the steamer.

The primary causes of the collision in my judgment were (1) the failure of both boats to signal, as required by the rules, when at a distance of one-half a mile from each other, a rule which the presence of the ferryboat and the steamer's change of course made it specially necessary to observe; (2) the steamer's lack of timely attention to the tug, and her changes of course, which embarrassed the navigation of the tug; (3) her failure to reverse at the time the signal was given, as she was then not more than 300 yards away, and must have been pointing nearly for the tug and was probably still under some swing to the southward from her previous starboard helm; (4) the failure of the tug to take timely, original and effective measures to avoid collision by giving a signal either of one whistle or of two; and (5) her failure to reverse and give a signal of one whistle at the time when she saw the steamer change her course to the westward, to prevent the steamer from again swinging to the southward.

The libelant is entitled to a decree against both steamers, with costs.

F. D. Sturges, for appellant Old Dominion S. S. Co.

H. Galbraith Ward, for appellant Pennsylvania R. Co.

Le Roy Gove, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. The Delaware was on her way from the foot of Rivington street, East river, to Harsimus cove, N. J., North river. Her navigation was temporarily in charge of a deckhand, McGee, the master having gone below for a few minutes. She was heading for the upper rack of the Communipaw ferry, when McGee first saw the Guyandotte. The steamship left her pier at Beach street, and came down in about the middle of the North river. While passing down she encountered the Brooklyn Annex ferryboat, outward bound from the Pennsylvania slip, ported to pass under the ferryboat's stern, and then starboarded to get back on her course. The navigator of the tug saw the Guyandotte, on his starboard hand, when she was opposite Courtlandt Street ferry, as he estimates about one-half to three-quarters of a mile distant. He saw the Annex boat, saw the Guyandotte sheer to starboard, saw her pass under the stern

of the ferryboat, and then swing to port again, till she got back to her original course, when she stopped and steadied, headed down the river about for the forward end of the float. Then, and not till then, as he says, the Guyandotte blew one whistle, he answered with one whistle, and rang two bells, and a jingle to go full speed astern. By this exchange of signals it was agreed that the privileged vessel (the Guyandotte) should pass across the bows of the burdened vessel (the Delaware). At the time the first signal was blown the vessels were 300 yards or more apart. The navigators of both vessels and the counsel for both claimants all insist that had both vessels thereafter navigated in conformity to agreement there would have been no collision, and, in our opinion, the evidence entirely supports their conclusions. The district judge was inclined to doubt this proposition, apparently for the reason that; as it turned out, "the float nearly escaped by going ahead"; but he seems to have overlooked the fact that for a sufficient time before collision to reduce her speed materially below six knots the Guyandotte was reversing at full speed. Inasmuch, therefore, as there was time and room for both vessels to act in accordance with the agreement, and thus avoid collision, the risk of collision, assuming that it theretofore existed, was terminated by the agreement, and it will be wholly unnecessary to discuss the prior navigation, or to determine whether in their earlier maneuvers either vessel had committed any fault. The real question in the case is whether either or both vessels navigated contrary to the agreement, and thus brought about the collision. Indisputably the Delaware did so navigate. As has been seen, McGee, who was at wheel, saw the Guyandotte swing to go under the stern of the Annex boat, saw her swing back to port, and says that she had stopped her swing to port, and had "steadied up, and headed down the river," before she gave the single whistle. He says that he had stopped his engines while the ferryboat was passing between them. There is some dispute as to whether he stopped thus early, but the precise time is immaterial. since, immediately upon replying with the single blast, he reversed at full speed. He was evidently alert, prudent, and careful, and had he been left to complete, undisturbed, the navigation he began, there would have been no collision, the headway of the Delaware, angling up across an ebb tide, would have been checked, if not entirely overcome, and the Guyandotte could have passed safely across her bows. Most unfortunately for the Delaware, however, her master's temporary business below had terminated. He heard the single whistle of the Delaware; also the two bells to back. He thereupon hurried into the pilot house, and "gave bells to stop and go ahead and hook her up at full speed." His reason for so doing, as he says, is that he found the bow of the float had already passed across the line of the Guyandotte's course, so that she was heading for the side of the float about amidships. The vessels were then, as he says, about two float lengths (370 feet) apart. So soon after reversal was his contradictory order given that McGee's effort to conform the Delaware's navigation to her agreement was not continued long enough to have any appreciable effect. Entirely uninformed as to prior movements of the vessels, the

master was in no position to judge whether the Guyandotte was continuing to swing to port,—McGee, who was in a position to know, says she was not,—and, ignorant of the agreement between them (he had not heard the Guyandotte's whistle), his interference with McGee's arrangements was most ill-advised. The result was that, perceiving the Delaware was keeping on her original course with no apparent slackening of speed, the master of the Guyandotte ordered her engines stopped and reversed,—a movement which was continued an appreciable time (the master and engineer say two minutes, probably an over-estimate), and so reduced her headway that she struck the float some 25 to 30 feet from its after end. That the Delaware failed to navigate conformably to agreement is undisputed, and that such failure brought about the collision seems to be entirely clear upon the proofs.

The charge made by the Delaware against the Guyandotte is that she did not hold her course after the exchange of signals, but continued swinging to port, by reason, as is suggested, of her endeavor to return to her original course after the swinging to the westward to pass the Annex boat. The witnesses from the Guyandotte testify that they ported upon the exchange of signals, but, even if we entirely disregard their testimony, we can find no support for the contention that her starboard swing continued after the exchange of signals, in view of the express, distinct, and reiterated statements of McGee, acting pilot of the Delaware, that the Guyandotte had steadied before that time. We have, then, two vessels crossing on courses where the starboard hand rule applies, a proposition by the privileged vessel to cross the other's bows, there being ample room and time for the execution of such maneuver if both co-operate, an acceptance of such proposition, an admitted failure by the burdened vessel to conform her navigation to agreement, with no sufficient proof of a like failure by the other, and a consequent collision. Under such circumstances, the burdened vessel is to be held solely in fault.

The decree of the district court is reversed, and cause remanded, with instructions to decree for full damages to libelant against the Delaware, and costs of this court to the Guyandotte against the Delaware.